Wesley D. FREEMAN, Petitioner,

v.

DISTRICT OF COLUMBIA DEPART-
MENT OF EMPLOYMENT
SERVICES, Respondent.

No. 89–362.

District of Columbia Court of Appeals.

Submitted April 5, 1990.
Decided June 6, 1990.

Wesley D. Freeman, pro se.

Michael D. Milwee, was on the brief for respondent.

Before FERREN and FARRELL, Associate Judges, and MACK, Senior Judge.

FARRELL, Associate Judge:

Wesley Freeman (Freeman or petitioner) appeals the decision of the Department of Employment Services[1] (DOES) denying him unemployment compensation benefits on the ground that he was discharged for misconduct.[2] An appeals examiner (the examiner) concluded that the employer had carried its burden of adducing evidence sufficient to support a finding that petitioner had intentionally violated the employer's cash-handling policy.[3] The examiner, also found, citing the employer's affirmative response to her own question whether the policy was consistently enforced, that "claimant's conduct was not tolerated by the employer." However, because the finding of consistent enforcement of the policy—required by 7 DCMR § 312.4(c) (1986) as a prerequisite to disqualification for willful violation of an employer's rules—is unsupported by substantial evidence, we are compelled to reverse.

I.

In November 1988, Freeman, then manager of a Burger King fast food outlet in Beltsville, Maryland, was discharged for failing to make a bank deposit in accordance with his employer's established cash-handling procedures.[4] Company policy re-

---

1. Because the final decision of the Department of Employment Services Office of Appeals and Review merely affirmed the findings and conclusions of the appeals examiner, we focus our analysis on the decision of the appeals examiner.

2. The District of Columbia Unemployment Compensation Act provides:

> [A]ny individual who has been discharged for misconduct occurring in the course of his most recent work, as determined under duly prescribed regulations, shall not be eligible for benefits....

D.C.Code § 46–111(b)(1) (1987). Section 46–111(b) further provides, in part:

> (2) For the purposes of this section, the term "misconduct" means an act of willful disregard of the employer's interests, a deliberate violation of the employer's rules, a disregard of standards of behavior which the employer has a right to expect of his employees, negligence to such a degree or recurrence as to manifest culpability, wrongful intent, or evil design, or showing an intention and substantial disregard of the employer's interests or of the employee's duties and obligations to the employer.
>
> (3) The District of Columbia Unemployment Compensation Board shall add to its

rules and regulations specific examples of behavior that constitute misconduct within the meaning of this subsection.

3. Like the statute, the Board's regulations identify "[w]illful violation of employer's rules" as disqualifying misconduct. 7 DCMR § 312.3 (1986).

4. On this appeal, and before the appeals examiner, petitioner insisted that he was not discharged for failure to observe proper cash-handling procedures, but rather for theft of the receipts in question. He testified that he was not terminated until after he failed a polygraph test administered as part of the investigation of the missing money. Crediting the employer's testimony, the examiner found that petitioner was terminated for violation of the deposit policy, and not for stealing the money. See (Herbert) Jones v. District of Columbia Dep't of Employment Servs., 395 A.2d 392, 395 (D.C.1978), aff'd after remand, 451 A.2d 295 (D.C.1982), citing Green v. District Unemployment Compensation Bd., 346 A.2d 252, 256 (D.C.1975) (agency finding of misconduct must be based on same reason specified by employer). As there is substantial record evidence to support that finding, we do not disturb it, and assume the "miscon-

quired managers to count and record the cash receipts at the end of shifts ending at 5:00 p.m. and 8:00 p.m., and to deposit them in a nearby bank. The periodic deposit policy prevented accumulation of more than one shift's receipts on the premises, thus minimizing the amount at risk in the event of theft or robbery.

On November 19, 1988, Freeman left the receipts of the 5:00 p.m. to 8:00 p.m. shift, which were to be deposited at 8:00 p.m., in the safe on the premises after closing. Sometime between closing that evening and opening the following day, all the cash in the safe was stolen. The theft resulted in loss not only of the closing shift receipts and the store operating fund, but also of the 5:00 to 8:00 p.m. shift receipts which Freeman had failed to deposit. Freeman was terminated the following day.

A deputy claims examiner denied petitioner's initial request for unemployment compensation benefits, concluding that Freeman's failure to make the 8:00 deposit constituted willful misconduct occurring in the course of work. Freeman noted a timely appeal, which came on for hearing de novo before an appeals examiner on January 29, 1989. After hearing testimony from Carlo Zias, speaking on behalf of Burger King, and Freeman, the examiner affirmed the denial of benefits, concluding that the employer had carried its burden of establishing that the employee's failure to make a bank deposit of receipts was a violation of his employer's rule, and misconduct within the meaning of the Act. The Office of Appeals and Review affirmed.

## II.

### A.

■ Regulations governing denial of benefits for misconduct specifically provide

that if willful violation of the employer's rules is the basis for a disqualification from benefits because of misconduct, the Director shall determine the following:

(a) That the existence of the employer's rule was known to the employee;

(b) That the employer's rule is reasonable; and

(c) That the employer's rule is consistently enforced by the employer.

7 DCMR § 312.4. *See also (Kenneth) Jones v. District of Columbia Dep't of Employment Servs.*, 558 A.2d 341, 342 (D.C.1989); *Curtis v. District of Columbia Dep't of Employment Servs.*, 490 A.2d 178, 179 (D.C.1985). While we may not disturb a final decision of the DOES "if it rationally flows from the facts relied upon and those facts or findings are substantially supported by the evidence of record ... we are required to set DOES holdings aside if they are not supported by substantial evidence in the record." *Jadallah v. District of Columbia Dep't of Employment Servs.*, 476 A.2d 671, 675 (D.C.1984). This standard guides our review of the examiner's findings as to the prerequisites for denial of benefits for violation of an employer's rules under 7 DCMR § 312.4. *(Kenneth) Jones v. District of Columbia Dep't of Employment Servs., supra*, 558 A.2d at 342-43.

The examiner found that Freeman was aware of the cash-handling policy obliging him to make the 8:00 deposit, but ignored it. The petitioner effectively conceded this during the hearing, and the record contains ample other evidence indicating that he was aware of the policy and that the possible consequences of violating it included termination.[5] We also do not question the

---

duct" in question was a violation of the employer's cash deposit rule.

**5.** Mr. Zias testified, without contradiction by petitioner, that petitioner had attended a seminar for all assistant managers at which the cash-handling policy "was strongly stressed." In addition, in evidence was a document from the employer, signed by petitioner, entitled *Security and Cash Handling Procedures* setting out

the cash deposit policy and the following paragraph:

All of the above rules are for your own personal safety and that of your hourly employees. Any violation of the above rules will result in disciplinary action and/or termination. Republic Foods, Inc. is authorized to withhold any monies lost due to my not following any of the above rules.

Finally, Freeman admitted that he was aware of the rules, that they were reasonable, and that

examiner's finding as to the reasonableness of the policy on its face. Zias testified that the cash deposit policy was intended to minimize the risks associated with accumulation of a large amount of cash on the premises. And, although petitioner testified that compliance with the rule was not possible because he did not have a car to drive to the bank, Zias testified that the bank was "within walking distance ... less than a block's distance," and petitioner conceded that the bank was "down the street ... about a 15, maybe 20 minute walk."[6] In sum, substantial evidence and sound reasoning supports the examiner's findings on these matters.

■ On the other hand, in circumstances where the employer enforces a rule haphazardly or not at all, the employee's mere awareness of the rule's existence and of the hypothetical possibility of discharge for violating it cannot suffice to put the employee "on notice that if he should proceed with his conduct, he will damage some legitimate interest of the employer for which he could be discharged." *(Herbert) Jones v. District of Columbia Dep't of Employment Servs.*, *supra* note 4, 395 A.2d at 395; *Williams v. District of Columbia Dep't of Employment Servs.*, 383 A.2d 345, 349 (D.C.1978). *See also (Kenneth) Jones*, *supra*, 558 A.2d at 342, *citing Colton v. District of Columbia Dep't of Employment Servs.*, 484 A.2d 550, 553 (D.C.1984) ("critical inquiry" is whether employee was on notice that he could be discharged for his actions).

Reflecting this aspect of fair notice to the employee, which is a general requirement "implied in the statutory [misconduct] standards," *Williams, supra*, 383 A.2d at 349, section 312.4 (c) of the regulation en-

sures that the employer does not, by inaction or forbearance, lull the employee into believing the rule may be disregarded with impunity. On this point, the examiner found that "[t]he claimant's conduct was not tolerated by the employer," a finding we conclude is unsupported by sufficient record proof to withstand even the deferential standard that guides our review.

### B.

During the employer's case-in-chief, Mr. Zias made no reference to consistent enforcement of the cash-handling rule, other than to emphasize that the company expected all managers to comply with it. Zias' only specific testimony on consistent enforcement occurred in the following exchange between himself and the examiner:

That concludes the testimony of the Employer. Is there any cross-examination of the Employer by the claimant? Just a minute, before I ask that. The claimant was aware of the rules, correct?

MR. ZIAS: Yes, that's correct.

EXAMINER: The rules were reasonable?

MR. ZIAS: Yes, they were.

EXAMINER: And consistently enforced?

MR. ZIAS: Yes, they are.

By contrast, several times during his testimony, petitioner asserted that although usually he was able to get one of his "production leaders" to make the 5:00 deposit, during the two months he was employed at the Beltsville store he regularly left the 8:00 p.m. deposit in the safe, with the knowledge of his supervisor, and that the employer took no action until, on the present occasion, the money turned up missing.[7] Although Zias on rebuttal em-

---

compliance with them was expected of all managers.

**6.** Petitioner also testified that he could not take the time to walk to the bank because, unlike during the day shift, when two managers were on duty, he was the only manager on duty and could not leave the store. On rebuttal, Zias *testified that the store supervisor had no car* and had been able to make her deposits, that six days out of the week only one manager was on duty during the day shift, and that, in the event

it became impossible for a manager to make a deposit, managers were aware that "it is critical that the district manager be contacted, and we are available by phone, answering service or beeper number."

**7.** The transcript reads:

MR. FREEMAN: The situation was I didn't have time to make an 8 o'clock deposit. There was no way I could get to the bank and the girl that was working, I asked her, she said she would take it later for me but she

phasized that the manager's responsibility to make the deposits could not be delegated to subordinates, that Freeman was aware of this responsibility, and that the "transportation problem" was no excuse, Freeman's testimony about his immediate supervisor's repeated acquiescence in the violation of the cash-deposit policy essentially went unrebutted.

 DOES suggests in its brief that we should "ignore" Freeman's testimony on this point in favor of Zias' testimony that petitioner was instructed more than once that "it was the manager's responsibility to see that the deposits were made" and petitioner's own testimony that "he was aware of this responsibility." We do not agree. While this evidence established that Freeman had knowledge of the rule within the meaning of 7 DCMR § 312.4(a), it sheds little light on the material issue of the employer's possible forbearance in enforcing it raised by Freeman's testimony. We note that the "knowledge of employer's rule" and "consistent enforcement" re-

quirements in 7 DCMR § 312.4 are independent and conjunctive. If evidence of the employee's awareness that the employer expected the employee to conduct himself in a certain manner were sufficient to demonstrate "misconduct" as the regulation has defined it, the regulation's requirement of proof that the employer's abstract expectation was actually enforced consistently would be superfluous.

 In sum, there was extensive testimony by petitioner placing consistency of enforcement squarely in issue, and almost nothing to the contrary beyond the employer's affirmative answer to the examiner's single question whether the policy was consistently enforced. In these circumstances, we cannot say that the finding that "the claimant's conduct was not tolerated by the employer" is supported by substantial evidence in the record. We do not hold that the employer was required to show actual instances when managers had been disciplined for violation of this or similar policies. Nor was the employer's failure to

> never did take it. So I had no problem leaving it inside the safe, inside the Burger King—
> EXAMINER: You did what?
> MR. FREEMAN: I always left my 8 o'clock in the safe because I couldn't make it to the bank, didn't have a car to get to the bank to make the deposit. I didn't have transportation.
> EXAMINER: Well, how do you usually make it?
> MR. FREEMAN: I never did make an 8 o'clock deposit.
> EXAMINER: You mean in the last two years of working there, you never made an 8 o'clock deposit?
> MR. FREEMAN: Well, this Burger King now, I was to another one at 16th and K Street and the deposit [bank] was next door. You could walk and drop it next door, but I got transferred to the Beltsville Burger King and you have to have transportation to make a deposit.
> EXAMINER: All right. Well, why didn't you bring this to the Employer's attention?
> MR. FREEMAN: I told them that, and I left it [in] the safe and they had no problems with me leaving it in the safe.
> EXAMINER: When did you tell them that, that you couldn't make the 8 o'clock deposit?
> MR. FREEMAN: I've been telling the supervisor that.
> EXAMINER: This gentleman [Mr. Zias]?
> MR. FREEMAN: No, the supervisor of the store and nothing was ever said about it.

> EXAMINER: All right. So you never made an 8 o'clock deposit?
> MR. FREEMAN: No.
> EXAMINER: And how long had you been at that store?
> MR. FREEMAN: About two months.
>
> *　　*　　*　　*　　*　　*
>
> MR. FREEMAN: I never did make the deposit.
>
> *　　*　　*　　*　　*　　*
>
> I never did. Mine was always left in the safe to get someone to take it to the bank for me. They would take it, someone with a car. And when I did make them, this girl called Tina, she would make them for me, or either Brian before he would leave at 5 o'clock, he would make my 5 o'clock deposit.
>
> *　　*　　*　　*　　*　　*
>
> EXAMINER: So each night. when you'd cash out at 8 o'clock and close out, you would just leave the money in the safe. And then what would you do about that money getting to the bank?
> MR. FREEMAN: Well, the person that opened the store the next morning would deposit it before I came in on duty at 3 o'clock. I mean, they had no problem with it until now. I mean, the whole while leaving it in the safe, it was okay, but no sooner it got missing, you know, they make a big fuss out of it.

call as a witness petitioner's store supervisor—who assertedly had condoned his repeated violations—necessarily fatal to the employer's case. What is lacking from the record, however, is any evidence of the manner by which the employer monitored and enforced compliance with the cash-handling policy. And the examiner's attempt to correct the deficiencies in the employer's proof merely by asking Zias the ultimate question in a form calling for a yes/no answer was no substitute for adequate record evidence. Thus, the examiner's conclusion that the employer carried its burden of proving that Freeman was discharged for willful violation of the employer's rules—misconduct within the meaning of the statute—does not rationally flow from the facts of record, and must be reversed. *See (Kenneth) Jones, supra,* 558 A.2d at 343 (decision denying benefits reversed and remanded when record revealed inconsistent enforcement).

### III.

This is not the first time we have seen the inquiry concerning consistent enforcement handled by an examiner in conclusory fashion. In this case, it was conducted almost as an afterthought. Possibly, with brief follow-up questioning by the examiner, Zias could have furnished information about the employer's supervision sufficient to support his conclusory answer, but on this record we cannot be certain. Hence this appears to be a subject on which the agency's examiners need further instruction or admonition by the Director, bearing in mind the importance of this component of a finding of misconduct, and the examiner's general obligation "to ensure ... the presentation of all relevant issues for consideration and incorporation in any decision." 7 DCMR § 307.1.

*Reversed and remanded.*